Argued and submitted July 25, 2006 affirmed October 31, 2007

STATE OF OREGON,
*Respondent,*

*v.*

BOBBY EARL FOUST,
*Appellant.*

01081858; A120619

170 P3d 1118

Erin Galli Rohr argued the cause for appellant. With her on the brief was Chilton, Ebbett & Rohr, LLC.

Christina M. Hutchins, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Landau* and Ortega, Judges.

ORTEGA, J.

_____

* Landau, J., *vice* Richardson, S. J.

## ORTEGA, J.

Defendant was convicted of crimes including six counts of aggravated theft and 10 counts of the lesser-included offense of first-degree theft. On appeal, he assigns error to the trial court's denial of his motion for a judgment of acquittal on the theft charges.[1] Viewing the evidence in the light most favorable to the state to determine whether a rational trier of fact could have found, beyond a reasonable doubt, the essential elements of the crime, *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998), we affirm.

Defendant's convictions arose from his involvement in Lane Funding Association (LFA). Defendant was convicted of the theft of money that, according to the indictment, was "the property of Lane Funding Association."

Bobi Lane was the general manager of LFA.[2] LFA was a trust, whose trustees purportedly decided matters including where to invest funds and how much interest to pay investors who made "loans" to LFA. According to Lane, she was required to obtain the trustees' approval to hire employees and pay wages. In reality, however, LFA was not operated in compliance with the trust documents, and no trustees were involved in its operation.

Defendant worked for LFA, recruiting investors to make "loans" to LFA. Defendant told the lenders whom he recruited that their funds would be pooled and used to finance short-term construction loans through overseas banks. LFA's "Private Loan Contract" with lenders (the loan contract) offered a 10 percent monthly return on their loans to LFA. The loan contract stated that funds would be "utilized to enter into secured bank trading program(s)" and that lenders' "principal deposit(s) [would] NOT be put at risk whatsoever." Defendant told lenders that the Federal Bureau of Investigation had investigated LFA and had been

---

[1] Defendant also assigns error to the trial court's denial of his motion for a judgment of acquittal—which defendant and the state agree was effectively a demurrer—on four counts of securities fraud. We reject that assignment of error without discussion.

[2] Defendant was tried with three codefendants: Lane; Lane's husband, Darryl Garrett; and defendant's wife, Margaret Chapman.

unable to find any fault with the program. He also showed lenders spreadsheets indicating that LFA had several million dollars in assets.

Defendant described LFA to lenders as an investment company. The loans made to LFA were investment contracts and thus were securities under Oregon law. *See* ORS 59.015(19)(a) (defining "security" to include an "investment contract"). A representative of the Oregon Division of Finance and Corporate Securities told Lane, before the events giving rise to this case, that a similar arrangement (also labeled a trust) was likely an investment contract. Nevertheless, the LFA loan contract stated, "This is not an offer or the sale of a [s]ecurity." A similar statement appeared on each page of the loan contract.

Defendant and his codefendants purportedly invested in LFA and had individual accounts. Defendant told some lenders that he was living off the interest that he earned on his accounts with LFA. Defendant received at least one $10,000 payment from LFA that his codefendant Chapman attributed to a withdrawal from his accounts, although she admitted that she had no record of an account owned by defendant from which that withdrawal could have been made. During LFA's operation, defendant also accepted payments from LFA that he characterizes on appeal as "regular salary payments."

Consistently with what lenders were told about the returns on their investments, LFA's records indicated that lenders' accounts grew by about 10 percent each month. The loaned funds were not actually invested, however. Instead, the funds were simply placed in LFA's checking accounts, which earned little or no interest. Payments to lenders who withdrew money from their accounts had to be made using money from other lenders. Defendant arranged transactions involving at least one of LFA's checking accounts. LFA eventually stopped operations, and lenders were told (falsely) that the Internal Revenue Service had placed a freeze on operations. Some lenders lost their entire investments.

At the close of the state's case, defendant moved for a judgment of acquittal on the theft charges. The trial court denied the motion. On appeal, defendant contends that the

trial court erred by denying the motion, because the state failed to prove that LFA's right to possession of the funds at issue was superior to his. In defendant's view, he did not commit theft of funds owned by LFA, because Lane, as LFA's principal, voluntarily transferred the money to him. The state responds that the evidence was sufficient for the jury to conclude that defendant acted with Lane "to operate LFA in violation of the terms of the trust and private loan contracts LFA entered into with each lender" and that defendant either converted funds or aided and abetted others in converting funds from LFA.

To frame our analysis, we begin with the text of the statutes. ORS 164.015 provides, in part:

"A person commits theft when, with intent to deprive another of property or to appropriate property to the person or to a third person, the person:

"(1) Takes, appropriates, obtains or withholds such property from an owner thereof[.]"

Under ORS 164.005(4), " 'owner' means any person who has a right to possession thereof superior to that of the taker, obtainer or withholder." A "person" may mean "a public or private corporation, an unincorporated association, a partnership, a government or a governmental instrumentality." ORS 161.015(5). As pertinent here, a defendant is criminally liable for another's criminal conduct if the defendant, with the intent to promote or facilitate the crime, "[a]ids or abets or agrees or attempts to aid or abet such other person in planning or committing the crime[.]" ORS 161.155(2)(b).

We conclude that a reasonable jury could find that LFA, not Lane, was the owner of the funds at issue and that, because Lane did not have the authority to transfer LFA's money to defendant, LFA's right of possession was superior to defendant's. Lane claimed to be a lender with her own LFA investment accounts; she did not claim to own the funds in LFA's checking accounts. The jury could find that LFA was established and represented to lenders as a trust—that is, as an entity distinct from Lane herself—and that Lane was not the principal, but merely the general manager. According to Lane's own testimony, she was an employee of the trust who

needed approval from LFA's trustees to hire employees and to pay out funds. A jury could find that Lane had no approval from LFA's trustees to transfer money to defendant; indeed, a jury could find that Lane was not in contact with LFA's trustees throughout LFA's period of operations. In short, a reasonable jury could credit the evidence that LFA was a trust that owned the funds and that Lane, its manager, transferred its money to defendant without any authorization to do so. The jury thus could conclude that LFA had a right of possession superior to defendant's right.

Defendant contends that such a theory of LFA's ownership fails because, under Oregon securities law, LFA cannot be a trust—and thus, presumably, it was not an entity that could own property separately from Lane. Pursuant to defendant's convictions for crimes involving securities, the state established that the lenders' interests in LFA were securities—specifically, investment contracts. ORS 59.015(19)(a). Defendant reasons that LFA therefore cannot be a trust, because a security does not include "[a] beneficial interest in a voluntary inter vivos trust unless the trust * * * is part of an attempt to evade the provisions of [the Oregon Securities Law.]" ORS 59.015(19)(b)(B).

That, however, is exactly what a reasonable jury could infer—that LFA was part of an attempt to evade the Oregon Securities Law and thus is not subject to the exclusion applicable to other trusts. Defendant described LFA to lenders as an investment company, and Lane had been warned that such "loans" were likely securities. The loans made to LFA were investment contracts, yet defendant and his codefendants nevertheless represented to lenders that the loans were not securities. A jury could find that they did so as part of an effort to evade state securities laws. Despite lenders' investment contracts with LFA, a jury could conclude that LFA was a trust, that is, an entity distinct from Lane with ownership interests separate from those of Lane.

A reasonable jury also could find that, even if defendant did not directly take funds from LFA, he aided and abetted Lane in doing so. Although defendant contends that the state did not present an aid and abet theory in the trial court, not only did the state do so, but defendant acknowledged that

the theory was in play. After noting that the jury would be instructed on aiding and abetting, defendant's counsel explained to the jury in his closing argument that, if "you've decided that [defendant] didn't have a conscious objective to take anything from anybody, you still can consider [whether he had] a conscious objective to assist somebody else in doing that." A reasonable jury could conclude that defendant helped bring money into LFA, knowing that Lane was making unauthorized transfers of funds from LFA and intending to help her do so.

Affirmed.